**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00280 (TJK)** |
| **v.** | : | |
| | : | |
| **MICHAEL LEE HARDIN,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Lee Hardin ("Hardin") to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.    Introduction**

The defendant, Michael Lee Hardin, a retired homicide detective for the Salt Lake City Police Department, and his mother-in-law, Janet West Buhler ("Buhler") (Case No. 1:21-cr-510 (CKK)),[1] traveled by plane from Kaysville, Utah, to Washington, D.C. to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

---

[1]    Buhler has also pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See* Case No. 1:21-cr-510 (CKK), ECF No. 26. Buhler is not scheduled to be sentenced until June 1, 2022.

On January 21, 2022, Hardin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 45 days' imprisonment, with probation to follow, is appropriate in this case because Hardin: (1) entered and remained in a sensitive area of the Capitol Building, the Senate Gallery; (2) cheered as rioters physically crushed U.S. Capitol Police ("USCP") officers at the East Rotunda Doors; (3) was acutely aware, as a former police detective, of the dangers that his and other rioters' presence inside the Capitol posed to police officers and members of Congress, but he nevertheless stayed inside the Capitol even after witnessing violence against police officers; and (4) ignored several red flags upon entering the Capitol Building, including the smell of tear gas and plumes of smoke rising in the air, rioters scaling the scaffolding over the northwest staircase, and shards of broken glass on the ground as he entered  the Senate Wing Door.

The Court must also consider that Hardin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote.  Here, Hardin's participation in a riot that actually succeeded in halting the Congressional certification, coupled with his entry into the Senate Gallery, his celebration of violence against police officers that day, and his decision to continue penetrating the Capitol after witnessing this brutal violence against officers, renders a 45-day term of incarceration both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 29 (Statement of Offense), ¶¶ 1-7.  As this Court knows, a riot cannot

occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Hardin's conduct and behavior on January 6.

*Hardin's Role in the January 6, 2021 Attack on the Capitol*

Hardin and Buhler flew from Utah to Washington, D.C. on January 5, 2021. They attended the rally at the Ellipse for several hours the morning of January 6. They left the rally when they heard someone in the crowd announce that protesters were headed toward the U.S. Capitol.

As explained by Hardin during a post-plea interview, Hardin and Buhler approached the Capitol from the west front, near the Pennsylvania Avenue Walkway. Upon approaching the Capitol, Hardin could smell tear gas and could see plumes of smoke in the air. He could also see rioters climbing the scaffolding that had been erected over the northwest staircase. Hardin claimed that he did not have a good vantage point of the activity near the Lower West Terrace, but he undoubtedly would have heard the sounds of rioters clashing with police, including potentially the sounds of flashbang grenades and rioters shouting profanities at law enforcement.

Hardin and Buhler eventually climbed the northwest staircase to the Upper West Terrace and entered the Senate Wing door at approximately 2:25 p.m. – twelve minutes after rioters wielding weapons and stolen riot shields first shattered the windows and climbed inside the building. Hardin recalls seeing broken glass and shattered windows upon entering the building. Alarms were also blaring by the time Hardin entered the Senate Wing Door.[2] As seen in the surveillance footage screenshot below, rioters were still climbing through broken windows at the time that Hardin entered the building.

---

[2]   *See* https://d2hxwnssq7ss7g.cloudfront.net/s8XNlAskWNvi_cvt.mp4 (open-source video showing that alarms were blaring at approximately 2:15 p.m.).



*Figure 1: Rioters climbing through broken windows as Hardin (circled in red) enters the Senate Wing Door.*

Hardin and Buhler then made their way to the Crypt, where Buhler took a photo of Hardin posing next to a bust of Abraham Lincoln.



*Figure 2: Hardin posing next to a bust of Abraham Lincoln inside the Crypt.*

Inside the Crypt, Hardin saw rioters gathered in a corner of the Crypt, climbing atop the furniture, and shouting, "USA!"

4



*Figure 3: Hardin (circled in red) walking past rioters who are climbing on furniture and chanting "USA."*

Hardin and Buhler spent approximately six minutes inside the Crypt before going upstairs to the Rotunda.  They walked through the Rotunda and exited into the East Rotunda lobby.  There, they stood next to a marble pillar and watched for three minutes as rioters violently assaulted and physically crushed USCP officers who were guarding both sides of the East Rotunda doors.  *See* Exhibits 1-4.[4]  Video footage of this violent breach shows that alarms were blaring as rioters

---

[3]        This video is available at https://jan6attack.com/videos//4wIDySD7tKxo/.

[4]        Exhibits 1 through 3 are clips of U.S. Capitol Police surveillance footage depicting the breach of the East Rotunda doors.  Exhibit 4 is a video obtained from defendant Ronald Sandlin's computer pursuant to a search warrant.  *See United States v. Ronald Sandlin et al.*, 1:21-cr-88 (DLF).  These exhibits will be filed with the Court in advance of sentencing.

        Open-source videos also captured several different vantage points of the breach of the East Rotunda doors.  *See, e.g.*, https://d2hxwnssq7ss7g.cloudfront.net/tXIzFNM5yp9f_cvt.mp4 (Aerial view of rioters pushing past officers after the doors are breached.); https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec (Footage of the exterior breach of the East Rotunda Doors.  Rioters can be seen spraying officers with chemical irritants and striking officers with flag poles and other objects.); https://twitter.com/ParlerVideos/status/1381212386338672641 (Additional footage showing the external breach of the East Rotunda Doors.  Rioters appear to be shouting "heave" as they forcibly shove the officers.);

approached the USCP officers at the doors.  *See* Exhibit 4.  The windowpanes of the doors were

shattered, the officers looked panicked, and the rioters were shouting, "Get out the way," "1776,"

"Our House," "Push," and "Your life is not worth it.  You're going to die.  Get out the way."[5]  *Id.*

As seen in the surveillance footage, Hardin and Buhler began to cheer and clap the moment

the rioters breached the East Rotunda Doors.  *See* Exhibits 1 & 2.



*Figure 4: Screenshot from Exhibit 1, showing Hardin and Buhler cheering (Hardin) and clapping (Buhler) as rioters breached the East Rotunda Doors.*

---

https://twitter.com/ParlerVideos/status/1381212418278318083 (Rioters begin pouring into the Capitol Building after the East Rotunda doors are breached.  Hardin is visible standing next to the marble pillar at the 00:30 time stamp of the video.).

[5]    While Hardin and Buhler may not have heard everything being said by the rioters at the door, they would have, at the very least, heard the alarms blaring and the rioters chanting, "Push," "Our House," and "1776."



*Figure 5: Screenshot from Exhibit 2, showing Hardin and Buhler (circled in red) witnessing the violent breach of the East Rotunda doors.*



*Figure 6: Screenshot from Exhibit 3, showing officers being crushed as rioters force open the East Rotunda Doors. Hardin and Buhler, who are not visible in this photograph, were standing just behind the pillar on the left.*



*Figure 7: Open-source photograph of the breach of the East Rotunda Doors.*

Once the doors had been breached, and as the alarms continued to blare, hundreds of rioters poured

into the building and past USCP officers, who were pinned against the door.



*Figure 8: Hardin (circled in red) witnessed hundreds of rioters pour into the Capitol Building after the East
Rotunda Doors were breached.*



*Figure 9: Hardin and Buhler witnessed dozens of rioters enter the Capitol Building and ascend the staircase that they too would later ascend to get to the Senate Gallery.*

After witnessing this mob assault first-hand and at close range, Hardin and Buhler still did not leave the building.  Instead, they ascended the staircase to the third floor of the Capitol Building and walked through some hallways until they arrived at the doors to the Senate Gallery.  Hardin entered the Senate Gallery at approximately 2:44 p.m., and stayed there for two minutes.  He was one of only a handful of rioters to actually enter the Senate Gallery on January 6, 2021.



*Figure 10: Hardin and Buhler (both circled in red) entering the Senate Gallery.*



*Figure 11: Hardin (indicated with a red arrow) in the Senate Gallery.*

After leaving the Senate Gallery, Hardin and Buhler walked downstairs and wandered the hallways surrounding the Senate Chamber.  They ultimately left the Capitol Building through the Senate Carriage Door on the east side of the Capitol at approximately 2:53 p.m.  They spent a total of 28 minutes inside the Capitol Building.

*Hardin's Interview with the FBI*

Hardin participated in an interview with FBI agents on December 16, 2021.  Hardin was forthcoming during this interview and accurately recounted his time inside the Capitol.  He admitted to watching the rioters breach the East Rotunda doors.  He also admitted to sending text messages and photographs to friends and family members while inside the Capitol, including messages that said, "We stormed the Capitol, I am in here now!"; "I know you don't like Trump, but He is the rightful President"; and "We will return until we win!"  Hardin explained during this interview that at the time he sent those messages and photographs, he felt "patriotic."  He further stated that he was excited to show his family members videos of the crowd that participated in the breach of the Capitol on January 6.

During this interview, Hardin maintained that despite his two decades of police service, he did not realize he had broken the law on January 6 until he received a phone call from the FBI case agent.  According to Hardin, it somehow did not cross his mind on January 6 that, at the very least, he would have needed to go through security in order to enter the Capitol Building.  Hardin also maintained that he believed the media had portrayed something very different than what he personally experienced inside the Capitol on January 6.

Finally, Hardin admitted that he knew Congress was meeting on January 6 to certify the Electoral College vote count, and he further stated that he knew the senators had been evacuated by the time he entered the building.

Hardin was cooperative with the FBI during the interview and provided agents with passcodes to his digital devices.  While Hardin was able to provide a numeric passcode for his cell phone, he could not recall an alphabetical password for his phone which, according to FBI's forensic examiners, was needed to unlock the phone.  The FBI was never able to unlock Hardin's cell phone or search it.  The FBI was, however, able to access and search Hardin's laptop, but did not locate any items of evidentiary value there.  Hardin confirmed during his interview that he did not use or post to social media in connection with his participation in the January 6 riot.

*The Charges and Plea Agreement*

On April 1, 2021, Hardin was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 1.  He was arrested on April 2, 2021.  ECF No. 5.  On April 5, 2021, Hardin was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 21, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Hardin agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Hardin now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Hardin faces up to six months of imprisonment and a fine of up to $5,000.  Hardin must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As rioters entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Hardin's individual conduct, this Court, in determining a fair and just sentence on a spectrum of aggravating and mitigating factors, should look to a number

of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are neither exhaustive nor dispositive, they help to place each defendant on a spectrum as to his fair and just punishment.

To be clear, had Hardin personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Hardin's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Hardin ignored decades of police training and experience when he entered the U.S. Capitol on January 6.  He knew the gravity of the situation the moment he stepped foot on the Grounds and smelled tear gas in the air.  Even if he did not see any bike rack barricades or "Area Closed" signs as he approached the building, and even if he did not hear the dispersal order being broadcast from Metropolitan Police Department speakers posted on the West Front, nothing about the situation on the Grounds—not the rioters scaling the scaffolding, not the flashbang grenades erupting in the air, and not the sound of rioters clashing with law enforcement at the Lower West Terrace—would have suggested to any law-abiding citizen, much less a former police detective, that he should keep moving toward the Capitol.

Hardin claimed during his post-plea interview that he was unaware he had broken the law until he was called by the FBI in connection with this case.  But this statement strains credulity because at the time Hardin walked through the Senate Wing Door, rioters directly next to him were climbing through broken windows.  Also, because the door he walked through had been locked down and was now unsecure, a loud alarm was blaring as he entered.  At the very least, Hardin should have known at that moment that it was unlawful to enter the building.

As Hardin progressed through the Capitol, he witnessed rioters engaged in extreme acts of violence and destruction.  In particular, he witnessed rioters physically envelop and crush USCP officers stationed at the East Rotunda doors.  His reaction to this violence was to cheer and holler, even though he was acutely aware, based on his decades of training and experience as a police officer, of the life-threatening danger that USCP officers were in at that moment.  During his thirty minutes inside the Capitol, Hardin would have seen panicked officers frantically trying to secure the building and prevent more rioters from entering.  His immediate reaction should have been to leave; instead, he texted a friend, "We will return until we win!"

Finally, Hardin's entrance into the Senate Gallery is another aggravating factor in this case, especially since, as he admitted during his interview with the FBI, he knew that the senators had to be evacuated from that exact space only minutes before he entered.  Hardin's entry into the Senate Gallery also distinguishes him from the majority of misdemeanor defendants who did not enter sensitive areas of the Capitol on January 6.  A defendant's entry into a sensitive space, such as the Senate Gallery, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda.  A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.  That person's presence is even more

disruptive than the average misdemeanor rioter.  Physically occupying the Senate Gallery poses a greater threat and creates a greater impediment to members of Congress just trying to do their jobs than would a trespasser passing through a hallway.

Accordingly, the nature and the circumstances of this offense establish the need for a term of incarceration in this case.

### B.  Hardin's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), Hardin has no criminal history.  PSR ¶¶ 28-34.  He has four biological children and three stepchildren.  *Id.* ¶¶ 43, 45.  Only his sixteen-year-old stepchild resides at his home; his other six children, all adults, reside outside the home.  *Id.*  From September 1997 to December 2017, Hardin worked at the Salt Lake City Police Department, including as a homicide detective.  *Id.* ¶ 64.  After retiring from law enforcement, Hardin worked as a financial advisor.  *Id.* ¶¶ 62-63.  Hardin is currently self-employed as a real estate agent.  *Id.* ¶¶ 61-62.

Hardin's prior police service renders his conduct in this case more troubling.  Based on his decades of training and experience, Hardin should have known to leave the U.S. Capitol Grounds the moment he smelled tear gas in the air and saw plumes of smoke wafting through the sky.  At the very least, he should have known to leave when he entered a building through a door with smashed windows and an audible alarm sounding.  Perhaps most troubling is that Hardin cheered and celebrated as rioters engaged in a violent assault against fellow officers at the East Rotunda Doors.

Hardin has not, to the government's knowledge, posted in public forums about his participation in the January 6 riot.  But his private messages to family members and friends reveal that he was proud of having participated in the riot, and that he did not immediately regret his entry

into the Capitol.  To the contrary, he felt "patriotic" at the time, and he promised in his text messages to "return" until Trump was declared President.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[6]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins, 21-cr-188-RDM*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

It strains credulity that Hardin, a former big city police detective, did not appreciate that he had violated the law in the three months between January 6 and his arrest in this case. It is also deeply concerning that Hardin was so quick to ignore his decades of training and experience when he entered the Capitol on January 6. As a retired police officer, he was acutely attuned to the danger of mob activity. His decades of training should have taught him to leave after witnessing a mob of rioters violently attack USCP officers. Instead, he decided to proceed to the Senate Gallery, one of the most sensitive spaces inside the Capitol. Hardin's criminal conduct and dubious claims that he did not regard it as such show a need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7] Each offender must be sentenced based on his individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[8]  *See United States v. Anna*

---

[7]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC), *United States v. Douglas K. Wangler*,

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct," but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should also consider the sentence imposed on Tam Dinh Pham (Case No. 1:21-cr-109 (TJK)). Pham, a then-active police officer, deliberately ignored numerous red flags before entering the Capitol Building, including fallen barricades, blaring alarms, and chemical irritants. Upon entering the Capitol Building, Pham posed for photos next to a statue inside the Rotunda. Pham entered a sensitive space inside the Capitol – the office suite of Congressman and House Leader Kevin McCarthy. Finally, Pham claimed, even months after the riot, that he did not know or appreciate that he was not allowed to enter the Capitol Building on January 6.

Hardin shares every one of these aggravating factors with Pham. Granted, there is no evidence that Hardin tried to delete photos from his phone or mislead the FBI during his interview, as Pham did. But Hardin has one additional aggravating factor that Pham does not—Hardin decided to keep penetrating the Capitol even after witnessing a violent assault of police officers at

the East Rotunda Doors.  On December 10, 2021, this Court sentenced Pham to 45 days'
imprisonment and a $1,000 fine for violating 40 U.S.C. § 5104(e)(2)(G).  *Id.* ECF No. 43.

The Court may also consider the sentences imposed on rioters who entered or continued
walking through the Capitol Building even after witnessing brutal violence against police officers.
For example, Frank Scavo (Case No. 1:21-cr-254 (RCL)), like Hardin, witnessed the violent
breach of the East Rotunda Doors.  He stood outside the building, a couple feet away form the
front lines, and witnessed rioters in front of him physically assault officers, including by spraying
chemical irritants in their faces.  He witnessed the same destructive crush of police as Hardin did.
And, like Hardin, this violence did not deter Scavo, who ultimately ascended the same staircase as
Hardin did to reach the third floor of the Capitol Building.  On November 22, 2021, Judge
Lamberth sentenced Scavo to 60 days' imprisonment and a $5,000 fine for violating 40 U.S.C.
§ 5104(e)(2)(G).

Finally, the Court may also consider the sentences imposed on Anthony Mariotto (Case
No. 1:21-cr-94 (RBW)) and James Little (Case No. 1:21-cr-315 (RCL)), both of whom entered the
Senate Gallery.  Prior to entering the Capitol Building, both Mariotto and Little smelled tear gas
and witnessed rioters clashing with law enforcement on the Capitol Grounds.  Mariotto, like
Hardin, entered through the Senate Wing Door and observed the mob assault of USCP officers at
the East Rotunda Doors.

Both Little and Mariotto pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G).  For Little,
the government recommended a sentence of one month incarceration, 36 months' probation, and
$500 in restitution.  For Mariotto, the government recommended a sentence of four months'
incarceration, 36 months' probation, and $500 in restitution.  Little was sentenced by Judge
Lamberth on March 14, 2022 to 60 days' incarceration and 36 months' probation.  *See* Case No.

1:21-cr-315 (RCL), ECF No. 48.  Mariotto was sentenced by Judge Walton on December 28, 2021 to 36 months' probation.  *See* Case No. 1:21-cr-94 (RBW), ECF No. 39.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[9] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[10]  As a general matter, therefore, "a judge must sentence a federal offender to either a

---

[9]     A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[10]     Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at

*4. But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[11]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[11]    Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[12]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  *See generally United States v. Andrew Ericson*, Case No. 1:21-cr-507 (TNM) (twenty days of intermittent confinement, to be served on consecutive weekends within the defendant's first year of probation); *United States v. Dana Joe Winn*, Case No. 1:21-cr-139-2 (TNM) (ten days of intermittent confinement to be served for consecutive weekends within the defendant's first year of probation); *United States v. Dalton Ray Crase*, Case No. 1:21-cr-82-01 (CJN) (fifteen days of intermittent confinement to be served over five weekends within the defendant's first six months of probation); *United States v. Troy Williams*, Case No. 1:21-cr-82-02 (CJN) (fifteen days of intermittent confinement to be served

---

[12]    Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

over five weekends within the defendant's first six months of probation); *United States v. Brian E. Stenz*, Case No. 1:21-cr-456 (BAH) (fourteen days of intermittent confinement to be served consecutively); *United States v. Bobby Schornak*, Case No. 1:21-cr-278-01 (BAH) (twenty-eight days of intermittent confinement, to be served in two fourteen-day periods within the defendant's first year of probation); *United States v. Daniel Herendeen*, Case No. 1:21-cr-278-02 (BAH) (fourteen days of intermittent confinement, to be served in two seven-day periods within the defendant's first year of probation); *United States v. Brian McCreary*, Case No. 1:21-cr-125 (BAH) (42 days of intermittent confinement, to be served in three periods of fourteen days each within the defendant's first year of probation).

Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in the defendant's case given the requested 45-day imprisonment sentence.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Hardin to 45 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters

future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Hava Mirell*
HAVA ARIN LEVENSON MIRELL
CA Bar No. 311098
Assistant United States Attorney - Detailee
U.S. Attorney's Office
555 4th Street, N.W.,
Washington, D.C.  20530
Office: 213-894-0717
E-mail: Hava.Mirell@usdoj.gov