**SCOTT C. WILLIAMS (6687)**
43 East 400 South
Salt Lake City, Utah 84111
Telephone: (801) 220-0700
Cellular Phone: (801) 541-4726
Fax: (801) 364-3232
scwlegal@gmail.com

*Attorney for Defendant Michael Lee Hardin*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL LEE HARDIN, <br><br> Defendant. | **SENTENCING MEMORANDUM** <br><br><br> Case No. 0090:21-CR-280 <br><br> Honorable Timothy J. Kelly |

The Defendant, Michael Lee Hardin, by and through counsel of record, Scott C. Williams, hereby submits the following Sentencing Memorandum in support of his position at sentencing.

Mr. Hardin entered a plea of guilty to Count 4, Parading in a Capitol Building, a Class B Misdemeanor in violation of 40 USC §5104(e)(2)(G). After accepting the plea, this Court scheduled a sentencing to occur on April 11, 2022. This Court also ordered that parties to file any sentencing memoranda simultaneously, by April 4, 2022. Given such a process, counsel for Mr. Hardin will expect to rebut any positions taken by the Government which are deemed to be mistaken, misled, or unfair, during sentencing argument.

1

The single count of conviction does not trigger application of the sentencing guidelines. Thus, the present memorandum will be focused on general considerations at sentencing, and application of factors pursuant to 18 U.S.C. § 3553(a). In light of such factors, and the application of them to the particular circumstance of Mr. Hardin, counsel will ask this Court to impose a sentence that does not include a requirement of incarceration. Despite the general nature and circumstances of the offense, Mr. Hardin's particular actions on January 6, 2021 fall into the lower spectrum of comparable culpability and need for punishment, and this Court is possessed of sufficient alternatives to confinement to impose a sentence sufficient but not greater than necessary to meet the ends of justice without imposing a period of incarceration.[1]

## POSITION ON SENTENCING FACTORS

A sentence must be "sufficient, but not greater than necessary[.]" 18 U.S.C. § 3553(a). To that end, the sentencing court "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Ultimately, a court must "consider all of the § 3553(a) factors," to decide if "they support the sentence requested by a party." *Id.* These are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; and (4) the kinds of sentence and sentencing range established by the guidelines. *See* 18 U.S.C. § 3553(a)(1)-(4) (quotations omitted).

### *The Nature and Circumstances of the Offense*

There may be no other criminal circumstance where more is known than in the present case. The gut wrenching circumstances that unfolded on January 6, 2021 did so on live television, and

---

[1] As the parties have been ordered to file sentencing memoranda simultaneously, Mr. Hardin is not presently aware of whether the Government will be recommending a sentence that includes any period of incarceration.

have been replayed many times, in infinite detail. They are iterated in the course of the pleadings and discovery in the present case, both in general, and with regard to Mr. Hardin's particular involvement. Virtually everything he did upon entering the Capitol was captured on video.

The various offenses and circumstances of that day, which has led to thousands of individuals being charged with crimes, included very serious offense conduct, against police and other individuals, and against sacrosanct places and principles of our country.

However, it is also indisputable that the circumstances of January 6 were encompassed within a very broad spectrum of conduct, and by a wide variety of actors that also represent a very broad spectrum of personal characteristics, and of other relevant conduct.

Counsel for Mr. Hardin submits that the circumstances of Mr. Hardin's conduct and offense fall at the lowest level of these spectra.

Mr. Hardin has his political perspectives and, at the times, perhaps even preoccupations. Many people did. Many people do. But Mr. Hardin didn't even necessarily go to Washington D.C. to exhibit or protest them. He and his family discussed going to watch the speech and rally that had been advertised by then President Trump and other public figures. Others of his family would have liked to have gone, but his father in law had a sprained ankle, and his wife had taken too much time off of work. Thus, ultimately only he and his mother in law, Janet Buhler,[2] made the trip.

The two flew into town on January 5, walked around, had some dinner, and went to bed. They got up on the morning of the 6th and proceeded to the sight of the speech. On the way Mr. Hardin purchased two Trump beanie caps, the blue one that he ultimately wore during the day, and

---

[2] Ms. Buhler was charged months after Mr. Hardin with the same offenses based on what was essentially identical conduct—the two were side by side the entire day and the entire time they were inside the Capitol. She has entered a plea of guilty to the same offense as Mr. Hardin, and faces sentencing on June 1, 2022, to be conducted via Zoom. Mr. Hardin will not know what the Government will recommend by way of sentencing for Ms. Buhler, since the Government sentencing memorandum is not due in that case until May 4, 2022.

a pink one to take home to his wife, which can be seen tucked into his belt throughout the events. They each had small backpacks, so rather than take them off in order to enter the formal grounds of the rally, they watched from outside. They were moved by what they heard, particularly from President Trump. Many were. And in fact, many did move, as encouraged, towards the capitol. As they walked, they met various people, spoke with them about where they were from, and made small talk. Mr. Hardin witnessed various forms of escalation—people apparently on the scaffolding, people going up on the Capitol terrace. He saw some alarming individuals dressed in tactical gear that were pushing through the crowd, but he did not see where they ultimately went or what they ultimately did. Mr. Hardin doesn't recall seeing any actual acts of violence. But as many people began to move further onto the grounds of the Capitol, he and Ms. Buhler did too. They ascended the steps to the Terrace, where they took pictures and video of the surging crowds, and looked about.

      Continuing to be imbued with the herd mentality around them, the two approached the entry to the Capitol at the Senate wing. Windows had been broken, and people we streaming into the Capitol. The two entered through the doorway, followed people to the right, and so began their trespass through various areas of the Capitol. Throughout their wandering the two took pictures and video, often of the exhibits and information placards, staying out of and away from any actual groups of people, and to the back of the rooms, observing. Sadly, such observations included their witness to the forcible entry by rioters through the East Rotunda doors which were being manned by Capitol Police officers. They ultimately found themselves upstairs near the doorways to the balcony of the Senate chambers, where they can be seen entering to peer about and take some photos. They continued to walk along with people until they were ultimately informed by police officers of how and where to exit, and did so from the East entrance.

4

Mr. Hardin did not damage any property to gain entry into the Capitol. Nor did he damage any property while inside, nor help or encourage any other person to damage any property. He did not take any property. He did no violence to any person. He did not engage in chanting or protest. Admittedly, and regrettably, he also did nothing to interfere with anything he saw, including the forcible entry by others at the East Rotunda doors. He did not observe any other violence or property destruction while inside the Capitol, nor after he and Ms. Buhler exited on the East side.

Upon exiting, Mr. Hardin and Ms. Buhler walked back to their hotel. They took an Uber to a hotel closer to the airport to make easier their travels back to Salt Lake City, and the next morning they flew back home.

Mr. Hardin does not participate much in social media, and none since early 2021. He took pictures and video while at and in the Capitol, and texted with friends and family, which texts were ultimately used by his daughter to alert the authorities to his presence and culpability. But he never publicly glorified what he did on January 6, and he has accepted full responsibility for his utter lapse of judgment. Despite the repeated and regularly recurring characterizations--by everyone from officials of the Trump presidency to various United States legislators--of what people like he did as akin to a tourist tour, Mr. Hardin is genuinely dismayed that he could be so disjointed from his true character and history.

### *Mr. Hardin's History and Characteristics*

Mr, Hardin has lived a life that has been exemplary. (Character letters are attached hereto.) He served his community as a police officer and homicide detective for 20 years. As with many who perform this sometimes torturous occupation, it took a toll on his family relationship and marriage, which ended bitterly. However, he has remarried, and has had a positive and productive relationship with his wife and most of his family and extended family. He created a clientele of

largely ex law enforcement personnel in the course of his financial advisor profession that he built after his retirement from the police department. He has also been able to obtain a real estate license.

The reference to "has *had*" a positive and productive life is purposefully past tense: Mr. Hardin's spontaneous participation in the events of January 6, 2021, and his trespass in the Capitol, have utterly upended his life and profession. It has fractured his family ties. His business has been decimated due to his arrest and prosecution, and his association with the January 6 events. His mental health has suffered. He prays often for a return to some kind of normalcy and acceptance of society of his remorse and regret for having lost his judgment and succumbed to the herd mentality that led to his involvement in the trespass against the United States Capitol—one of the symbols of the very democracy and country that he cares fervently about.

The events of January 6, 2021 cannot be separated from politics and deeply held political beliefs, and the strong emotions that have been so inflamed by the political situation that had reached a true conflagration by the time that then President Trump ignited immediately prior to the siege on the Capitol. The delusions and lies that fueled the fire of that day were suffered and expressed by individuals at the highest levels of government, public figures, and would be role models. It has recently been discovered that such individuals even included Supreme Court Justice Clarence Thomas' wife Ginny Thomas. President Biden has repeatedly stated that Mr. Trump bears "sole responsibility" for the siege that he incited.

However, Mr. Hardin knows that is not the case. He knows that many, including himself, bear responsibility for their actions. The power and heat of the flame of group incitement ultimately resulted in the siege on the Capitol, and the herd mentality that caused so many like Mr. Hardin, who would never be likely to break even minor laws, to completely lose their judgment,

succumb to the herd mentality, and enter and trespass against their own Capitol. Mr. Hardin of course desperately wishes he had never even made the trip with Ms. Buhler to Washington D.C., much less attended Mr. Trump's speech, much less lost his judgment and trespassed against the Capitol building. But he knows he is not now being punished for his political views, but for his criminal actions. It is utterly despairing to him to find himself before a court for a criminal sentencing, marring a life marked by a history and circumstances that would have never predicted such a phenomenon.

Factors discussed in Application Note 3 to U.S.S.G. §5K2.20 consider leniency for aberrant behavior:

> In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense.

Each of these factors support leniency in Mr. Hardin's circumstance. Courts have also considered broader factors in light of the aberrant behavior, including:

> (1) degree of spontaneity; (2) amount of planning; (3) the singular nature of the criminal act; (4) the defendant's criminal record; (5) psychological disorders from which the defendant was suffering at the time of the offense; (6) extreme pressures under which the defendant was operating, including the pressure of losing his job; (7) letters from friends and family expressing shock at the defendant's behavior; (8) the defendant's motivations for committing the crime; (9) the level of pecuniary gain the defendant derives from the offense; (10) the defendant's charitable activities and prior good deeds; (11) his efforts to mitigate the effects of the crime; and (12) the defendant's employment history and economic support of his family.

*Zecevic v. U.S. Parole Comm'n*, 163 F.3d 731, 734-35 (2d Cir. 1998). To the extent that these various factors apply in the present case, all apply as mitigating factors in favor of leniency.

In many circumstances present counsel would cite to the various studies and judicial surveys that support a variety of considerations related to personal characteristics and how they

relate to the likelihood of an offender to be rehabilitated and potential for recidivism. Such factors include positive family ties[3], work history,[4] and others. Also, empirical studies roundly impeach the notion that incarceration decreases the likelihood of recidivism.[5] However, counsel respectfully submits that the present sentencing is not a circumstance where considerations of recidivism have much relevance. There is nothing about Mr. Hardin and his

---

[3] Studies show that supportive family connections predict reduced recidivism, while breaking up families leads to increased recidivism. Kimberly Bahna, *"It's a Family Affair" – The Incarceration of the American Family: Confronting Legal and Social Issues*, 28 U.S.F. L. Rev. 271, 285 (1994) (prisoners who have supportive families are less likely to recidivate); Shirley R. Klein *et al.*, *Inmate Family Functioning,* 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."). Additionally, in the Commission's survey of judges, 62% said that family ties and responsibilities is "ordinarily relevant" to the consideration of a departure or variance. USSC, *2010 Survey of Judges, supra*, at tbl. 13.

[4] The Sentencing Commission's own studies demonstrate that stable employment is associated with a lower risk of recidivism. *See* USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), *available at* http://www.ussc.gov/publicat/Recidivism_General.pdf; USSC, *Recidivism and the First Offender*. Laudable employment history has been held to be an appropriate consideration for downward variance. *See United States v. Munoz-Nava*, 524 F.3d 1137, 1143 (10th Cir. 2008). In fiscal year 2009, employment record was cited as a reason for a sentence below the advisory guideline range in 652 cases, representing 5.5% of all cases in which the court imposed a sentence below the guideline range. USSC, *2009 Sourcebook of Federal Sentencing Statistics*, tbls. 25, 25A, & 25B (2009). Of these, more than three-quarters involved only a variance under § 3553(a). In the Commission's recent survey of judges, 65% said that employment record is "ordinarily relevant" to the consideration of a departure or variance. USSC, *Results of Survey of United States District Judges January 2010 through March 2010*, tbl. 13 (2010), *available at* http://www.ussc.gov/Judge_Survey/2010/JudgeSurvey_201006.pdf.

[5] The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/nij/247350.pdf.

8

circumstance that suggests any likelihood that he will ever be a risk to offend in any similar or other fashion. The present sentence is simply about punishment.

Mr. Hardin has maintained perfect compliance with terms and conditions of his release.

***The Need For The Sentence, and the Kind of Sentence Available***

In consideration of the need for a particular sentence, this Court must consider the totality of both the circumstances of the offense and the circumstances of the defendant, but also the interests of society, though the sentence must be sufficient but not greater than needed to promote respect for law and appropriate punishment. Relevant to such consideration is any need for deterrence, protection of the public, and effective tools for rehabilitation of the defendant.

A sentence that does not include incarceration is available in this case. The offense is a misdemeanor, the misdemeanor of the century perhaps, but a misdemeanor nonetheless.[6] It is fair to say that generally misdemeanor offenses do not contemplate incarceration absent aggravating factors such as significant criminal history, physical injury or serious property damage, lack of remorse, etc.. This Court has ample options and resources that are available to impose a sentence of probation with conditions that meet the interests of justice as to Mr. Hardin in his individual circumstance.

The United States Supreme Court as opined that even a non-custodial sentence can satisfy the need for deterrence and justice:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).[FN4] Probationers may not leave the judicial district, move, or change jobs

---

[6] Class B misdemeanors are defined as "petty offenses" at 18 USC §§19 and 3583(b)(3).

9

> without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.
>
> FN4. See also Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13–14 (1957) ("Probation is not granted out of a spirit of leniency .... As the Wickersham Commission said, probation is not merely 'letting an offender off easily' "); 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999) ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist").

*Gall v. United States*, 552 U.S. 38, 48-49 (2007).

Mr. Hardin has also suffered very significant consequences due to his conduct on January 6. His occupation and livelihood has been decimated, his reputation has been sullied. His family is fractured. He is suffering, and will continue to suffer, the stigma of his actions. His entire family was detained at an airport and missed their flights in the course of a vacation because Mr. Hardin has unknowingly been placed on a no-fly list by TSA.

Such circumstances also factor into considerations of deterrence and respect for the law. There is no reason to believe that Mr. Hardin requires any particular sentence to be deterred from further criminal conduct—there is no suggestion that he needs any such deterrence. But considerations of *general* deterrence are relevant to criminal justice consequences as well. Inherent in the holding and philosophy of *Gall* is the idea that consequences other than prison may be very significant, and as such act as a general deterrent. It is hard to imagine any person who truly knew about the impact that Mr. Hardin's misdemeanor conduct on January 6 has had on him and his life would not be deterred from committing similar conduct (assuming, of course, that anyone in the particular state of mind and circumstance of that day would even be likely to be reflective and

immune from the mentality of the moment). Some forms of consequence and punishment are greater in significance than even incarceration.

The elephant in the room of this sentencing is Mr. Hardin's history as a police officer. This history is double edged. The initial reaction may very well be to use it against him—to condemn him as someone who should clearly have known better, and who should have been particularly repelled by any acts of force against and/or disrespect for law enforcement. Such a reaction is understandable, and Mr. Hardin would take no issue with it. The circumstances speak to the height of the situational phenomenon that caused him to completely lose ties to his otherwise common fidelity to his respect for his history and personal honor.

But Mr. Hardin's public service itself should not be held against him. He should be credited for it. He served honorably and well as a police officer for 20 years, and has been an honorable and productive member of our society. The present situational and aberrant circumstance should not completely mar that history.

### *Avoiding Unwarranted Sentencing Disparities*

It appears that other defendants charged and convicted of similar misdemeanors, and sentenced under similar offense conduct and personal characteristics, have not received a punishment of incarceration in connection with their probation. Counsel for Mr. Hardin has surveyed some of the misdemeanor cases that have been sentenced:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);

\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);

\*\**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);

\*\**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle,* 21- 00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.

\*\**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

In a relatively recent sentencing, defendant *Jenny Cudd* was apparently sentenced to $5,000 in fines and two months probation on a Class A misdemeanor, despite the government's request for 75 days of jail and 60 days community service, despite facts that she wore a bulletproof sweatshirt, advocated interruption of the electoral process, pushed law enforcement as she entered the Capitol, and celebrated the property destruction and events in internet posts and media interviews after January 6.  Report regarding Jenny Cudd sentence


In another recent sentencing, defendant Jacob Wiedrich reportedly received a sentence of probation with three months of home confinement and three years of probation.  In his circumstance he reportedly chanted "we ride for Trump, we die for Trump," stated in a Snapchat video that "we marched to the Capitol, broke a few windows," and was found to have brought back to his home a flag that he stole from the Capitol.   https://www.ksl.com/article/50331076/utah-man-avoids-jail-time-after-pleading-guilty-to-jan-6-capitol-riot-charge

Certainly there are counter-examples where courts have seen fit to impose some period of jail in connection with misdemeanor sentences. However, it appears that such cases had significant aggravating circumstances that distinguish them from the present case.

Mr. Hardin respectfully submits that there is nothing materially different about Mr. Hardin's sentencing circumstance that would warrant a variation from similar treatment as defendants that did not suffer incarceration as part of their misdemeanor sentences.

## **CONCLUSION**

Even before the Sentencing Guidelines became advisory, the United Supreme Court reminded jurists that:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment.

*Koon v. United States*, 518 U.S. 81, 113 (1996).

A sentence without incarceration is available, and warranted in connection with the totality of the circumstances in the present case. Mr. Hardin has no excuse for committing the serious offense of entering and trespassing in the Capitol on January 6, 2021, especially under the circumstances as they existed at the time he entered. As with so many other apparently normal and otherwise peaceful members of our society, he had fully consumed the Kool-Aid, and moved with a herd and with a herd mentality. He has paid dearly for it. He has lost virtually all that he had in the way of occupation and employment. The direct financial cost has been significant. The cost on his family, and in the form of stigma, had been significant, and will last well beyond any criminal sanction that he suffers. All signs are that he will satisfy any conditions of any probation that this Court may see fit to order, and thereafter work his way back into the respectable role that he had in his society.

RESPECTFULLY SUBMITTED this 4th day of April, 2022.

/s/ Scott C. Williams
Scott C. Williams
Attorney for Defendant Michael Hardin

KIRA ANNE WEST

By: _____/s/
Kira Anne West, *pro hac vice* counsel
DC Bar No. 993523
712 H Street N.E., Unit #509
Washington, D.C. 20002
Phone: 202-236-2042
kiraannewest@gmail.com

DELIVERY CERTIFICATE

I certify that a true and correct copy of the foregoing was caused to be delivered to all involved parties, by electronic filing, as well as email courtesy copy, on the 4th day of April, 2022, and on April 6, 2022.

/s/ Kira Anne West